## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## MIDLAND/ODESSA DIVISION

| | |
|---|---|
| HFT SOLUTIONS, LLC, | |
| *Plaintiff/Counterclaim Defendant*, | Case No. 7:25-CV-00415-DC-DTG |
| v. | JURY TRIAL DEMANDED |
| OPTIVER US LLC and OPTIVER TRADING US LLC, | |
| *Defendants/Counterclaim Plaintiffs*. | |

**PLAINTIFF HFT SOLUTIONS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND OF THE ASSERTED PATENTS ......................................... 1

III.  LEGAL STANDARDS ....................................................................................... 6

IV.   ARGUMENT ....................................................................................................... 6

      A.   Defendants' Proposals Do Not Clarify the Claims but Rather Rewrite Them ....... 6

      B.   Defendants' Proposed Construction of "Clock Domain Crossing Operations that Delay Processing" Impermissibly Rewrites the Claims ....................................... 7

           1.   The Claim Language As Written Draws a Targeted Distinction that Defendants' Proposed "Construction" Eliminates .................................... 8

           2.   The Plain and Ordinary Meaning Controls ............................................. 10

           3.   The Intrinsic Record Reinforces – rather than undermines – the plain and ordinary meaning as proffered in the claim as written ............................ 11

      C.   Defendants' Proposed Constructions of "Based at Least" and "Based at Least in Part" Impermissibly Rewrite the Claims ............................................................. 13

           1.   The Claim Language Establishes a Minimum Requirement for Input, Which Defendants Eliminate .................................................................... 14

           2.   The Intrinsic Record Does Not Support Optiver's Attempted Narrowing 15

V.    CONCLUSION ................................................................................................. 17

## TABLE OF AUTHORITIES

**Cases**

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
    358 F.3d 1371 (Fed. Cir. 2004) .................................................................... 6, 9, 14

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*,
    815 F.3d 1314 (Fed. Cir. 2016) .................................................................... 8, 9, 14

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
    750 F.3d 1304 (Fed. Cir. 2014) ........................................................................ 10

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
    327 F.3d 1364 (Fed. Cir. 2003) ........................................................................ 15

*Lab.'y Corp. of Am. Holdings v. Qiagen Scis., LLC*,
    148 F.4th 1350 (Fed. Cir. 2025) ...................................................................... 16

*Lantech, Inc. v. Keip Mach. Co.*,
    32 F.3d 542 (Fed. Cir. 1994) ............................................................................ 15

*Littelfuse, Inc. v. Mersen USA EP Corp.*,
    29 F.4th 1376 (Fed. Cir. 2022) ........................................................................ 12

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ................................................................. passim

*Quantum Corp. v. Rodime, PLC*,
    65 F.3d 1577 (Fed. Cir. 1995) .......................................................................... 15

*Renishaw PLC v. Marposs Societa' per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998) ........................................................................ 10

*Thorner v. Sony Comput. Ent. Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ........................................................... 6, 10, 11, 15

## I.   INTRODUCTION

This case presents no genuine dispute about the meaning of the claim language. The parties do not disagree about how a person of ordinary skill would understand the words used in the claims, nor do Defendants contend that the patentee redefined any term or disclaimed claim scope in the intrinsic record. Instead, Defendants ask the Court to replace the patentee's words with narrower language of Defendants' own choosing—deleting express modifiers and adding requirements not found in the claims. Claim construction does not permit such rewriting. Where, as here, the claim language is clear and the intrinsic record contains no lexicography or disavowal, the Court should apply the claims as written.

## II.   BACKGROUND OF THE ASSERTED PATENTS

The disputed terms appear in the asserted patents: 10,931,286 (the "'286 patent"), 11,128,305 (the "'305 patent"), and 11,575,381 (the "'381 patent").  The asserted patents are directed to a field programmable gate array ("FPGA") system used in the financial trading context. An FPGA is an integrated circuit (or computer chip) that can be programmed to perform specific functions or execute software commands. As described in the patents, FPGAs "may be used in applications that require fast processing since FPGAs allow for all computations to occur on a single chip."  Because all operations occur on a single chip, FPGAs are well suited to applications requiring extremely fast and deterministic processing. Ex. 1 ('305 patent) at 1:34-37.  As the patents explain, in high-frequency trading even nanoseconds of latency may be consequential, and minimizing processing delay is therefore a primary design objective. *Id*. at 1:37-39, 1:42-48.

FPGA systems frequently operate using multiple clock signals. Different functional blocks—such as receiving data, performing computations, and transmitting results—may each operate according to their own clock. When data must pass between portions of a system operating

1

on different clocks, the system must address what is known as a clock domain crossing ("CDC"). The asserted patents address a technological problem that arises in high-speed FPGA applications, where latencies, or delays, can be introduced due to clock misalignment, where the receiver side clock and the transmitter side clock are not synchronized. *Id.* at 1:39-41.

To prevent such errors, conventional FPGA designs at the time of the invention rely on clock domain crossing circuitry, such as or first-in/first-out ("FIFO") buffers. *See e.g.*, *id.* at 10:25-60 ("The clock domain crossing circuit [] may be an asynchronous FIFO or an asynchronous gearbox, to name a few."). These mechanisms ensure that data is transferred only when it is safe to do so, but they do so by holding or buffering data until an acceptable sampling moment arises. As a result, CDC circuitry commonly introduces additional clock cycles of latency beyond the system's inherent propagation delay. The patents recognize this trade-off: while CDC techniques promote better transfer, they do so at the expense of processing speed.

Figure 1C (shown below) of the specification illustrates the phase difference between the receiver-side clock ("RX Clock) and the transceiver-side Clock (TX Clock) in a conventional approach in which data crosses between independently operating clock domains and is buffered or synchronized to accommodate clock misalignment.  Ex. 1 at Fig. 1C; 10:30-34.



FIG. 1C

In such systems, the timing at which data is released from a FIFO or synchronizer depends on clock phase relationships and buffering behavior, leading to additional and often variable processing delay before data can be consumed by downstream logic.  In this example transmit side data (Read Data) lags more than a full cycle behind when it was made available on the receive side (Write Data).

The asserted patents solve this problem by utilizing a phase-locked control architecture in lieu of a clock domain crossing.  At a high level, the patented systems use a phase detector and control loop to monitor the relative phase between receiver-side and transmitter-side clocks. Based on that comparison, the system adjusts an oscillator or reference clock to maintain a deterministic phase relationship among clocks driving different portions of the FPGA. This architecture is illustrated, for example, in Figure 2 and Figure 6D of the '305 patent.

This system ensures deterministic timing and minimizes latency or delay by providing a structured, synchronized interaction among five key components: reference clock pins, deserializers, computational circuitry, serializers, and a phase detection and adjustment circuit.

3

Figure 2 of the '305 patent illustrates an embodiment of the FPGA system described in the asserted patents.



FIG. 2

At a high level, the figure shows how incoming high-speed data is received (shown in red), processed inside the FPGA (2100, denoted with the dashed line), and transmitted back out (shown in blue), while a separate phase-control circuit monitors and aligns clock signals (shown in green). On the receive side (left side of the figure), a serial data stream and a reference clock are provided to FPGA transceiver banks (2102). A deserializer (2104) converts the incoming high-speed serial data into parallel data that can be processed inside the FPGA core (2106). At the same time, a receiver-side clock is generated based on the received reference clock. The parallel data and the receiver-side clock are provided to computational logic ($2210^1$) inside the FPGA core. That logic performs operations on the data while operating in the receiver clock domain. Ex. 1 at 11:3-43.

---

[1] Figure 2 shows the receive side computational logic 2210a and the transmitting side computational logic 2210b as a single element 2210 and explains that it can be the single component shown or a plurality of logic elements. Ex. 1 at 11:28-29.

4

On the transmit side (right side of the figure), processed parallel data is sent to a serializer (2110). The serializer converts the parallel data back into a high-speed serial stream for output. Transmission is driven by a transmitter-side clock, which is derived from a reference clock input and associated clocking circuitry, including zero-delay buffer PLLs. Figure 2 also shows a phase detector (2206) and a phase-control loop. The phase detector compares clock signals associated with the receive and transmit paths. Based on that comparison, a controller adjusts an oscillator or reference clock to reduce phase differences between the two paths.

When clocks are phase-aligned in this manner, data transfers can occur without invoking latency-inducing clock domain crossing operations such as FIFOs or synchronizer chains. Instead of being stalled or buffered pending a safe crossing point, data progresses through the processing pipeline within a bounded timing window defined by known minimum and maximum delays. The specification explains that, once clocks are synchronized, timing remains fixed within these bounds, allowing predictable and deterministic operation without the additional cycles associated with conventional CDC circuitry.

Figure 6D contrasts with Figure 1C by depicting an architecture in which clock alignment constrains signal timing so that all relevant operations occur within defined delay limits. Ex. 1 at 19:66-20:5.



FIG. 6D

5

In this configuration, the system avoids introducing extra processing delays beyond inherent propagation delay, because there is no need to buffer or resynchronize data between misaligned clock domains.

## III.   LEGAL STANDARDS

Claim terms are given their plain and ordinary meaning as understood by a person of ordinary skill in the art in light of the intrinsic record. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). Courts depart from ordinary meaning only where the patentee clearly acted as its own lexicographer or unmistakably disavowed claim scope. *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365–66 (Fed. Cir. 2012). Claim construction explains what the claims mean; it may not rewrite claims, delete express limitations, or add requirements the patentee did not choose. *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).

## IV.   ARGUMENT

### A.   Defendants' Proposals Do Not Clarify the Claims but Rather Rewrite Them

Claim construction is intended to explain what the claim language means, not to change the language the patentee chose. See *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). Defendants' proposals do not seek to define or clarify claim terms; they **delete express modifiers, add new requirements, and substitute different words**, thereby changing the scope of the claims in a way claim construction does not permit.

This is evident when Defendants' "constructions" are placed side-by-side with the actual claim language.

| Claim / HFT | Optiver |
|---|---|

| "clock domain crossing operations that delay processing" | "Clock domain crossing operations [[that]], which inherently add a delay to the processing" |
|---|---|
| "based at least on the first clock signal" | "Based [[at least]] on the first clock signal alone or with other input(s)" |
| "based at least in part on the first clock signal" | "Based [[at least in part]] on the first clock signal and other input(s)" |

As this comparison of Optiver's claim construction against the claim makes clear, Optiver is not offering any construction that would clarify what "clock domain crossing operations" means, or what "delay processing" means; instead, it seeks to redraft the claim to add in limitations not consistent with the claim language as chosen by the patentee.

Similarly, Optiver seeks to redraft the other two limitations to remove the term "at least" and "at least in part." Optiver adds limitations to all three terms that are not supported by the intrinsic record and contrary to the plain meaning. "Clock domain crossing operations that delay processing" is addressed first and "based at least on the first clock signal" and "based at least in part on the first clock signal" are addressed next together.

**B.     Defendants' Proposed Construction of "Clock Domain Crossing Operations that Delay Processing" Impermissibly Rewrites the Claims**

| HFT | Optiver |
|---|---|
| Plain and ordinary meaning, no construction is necessary.<br><br>"Clock Domain Crossing Operations that Delay Processing" | "Clock domain crossing operations [[that]], which inherently add a delay to the processing" |

As written, the claim excludes only a **subset** of clock domain crossing operations— those **that delay processing**. The words "that delay processing" are an express, scope-defining limitation. They require a determination of whether the particular operation at issue actually delays

processing in the claimed system. Defendants' proposal removes that limitation altogether. By recasting the phrase as "clock domain crossing operations, which inherently add a delay," Defendants replace a conditional exclusion with a categorical rule that all clock domain crossing operations are excluded, regardless of effect. That is not clarification; it is substitution.

Courts may not delete express claim language or convert qualified limitations into absolute rules. A construction that "renders claim language meaningless or superfluous" is improper. *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1320 (Fed. Cir. 2016).

The scope change is concrete. Under the claim as written, clock domain crossing operations that do not delay processing are not excluded. Under Defendants' rewrite, they are. That is a substantive narrowing of the claim, not an explanation of it.

### 1. The Claim Language As Written Draws a Targeted Distinction that Defendants' Proposed "Construction" Eliminates

As written, the contested term excludes only a **subset** of clock domain crossing **operations**: those that delay processing. The phrase "that delay processing" is not surplusage; it is a restrictive clause that narrows the category of excluded operations. Defendants' proposed construction removes that distinction entirely. By redefining the phrase to mean "clock domain crossing operations, which inherently add a delay to the processing," Defendants erase the limiting clause and replace it with the assertion that all clock domain crossing operations inherently cause delay. The result is not an explanation of what "delay processing" means, but the elimination of the phrase altogether, and thus should be rejected.

Defendants' intentional rewriting of the claim is clear from their replacement of the restrictive "**that** delay processing" in the claim with the nonrestrictive "**which inherently** delay processing." But the dispute is not about grammar—it is about scope. The phrase "that delay processing" defines the scope of the excluded operations. Optiver's construction erases scope-

defining language by rewriting the claim to exclude only "clock domain crossing operations." That substitution is impermissible because it erases scope-defining language the patentee deliberately chose. The claims do not categorically exclude all clock domain crossing operations or clock domain crossing circuitry in general, they exclude only those "that delay processing."  The claim language poses a conditional inquiry, namely whether the particular clock domain crossing operation at issue delay processing.  If so, it is excluded; if not, it is not.

Defendants' rewrite removes that inquiry. Their construction excludes **all** clock domain crossing operations—regardless of whether they additionally delay processing—by asserting that delay is inherent in all such operations. This converts a conditional limitation into a categorical exclusion, materially narrowing claim scope. It is also not what is meant by the snippet of the specification that Defendants tether their entire argument: "***inherently add a delay*** to the processing that takes place in the FPGA". Optiver Opening Br. at 4. Put differently, whether a system contains circuitry associated with clocking is not determinative; what matters is **how that circuitry is used and whether the resulting operation delays data processing**. Reading the claims as excluding any clock-related circuitry would improperly collapse this operational distinction and impermissibly rewrite the claims.  Courts have repeatedly rejected constructions that transform conditional or qualified claim language into absolute rules not found in the claims.

That the patentee knew how to impose a categorical exclusion is confirmed by claim 1 of the '305 patent, which bars "use of a clock domain crossing circuit" without qualification. Where a categorical bar was intended, the patentee said so plainly. The inclusion of the qualifier "that delay processing" elsewhere reflects a conscious narrowing choice that courts must respect, not discard as surplusage. See *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1320 (Fed. Cir. 2016) (courts must give effect to the claim language actually used).  in the

claim text. *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004). Where a proposed construction deletes express limiting language and replaces it with broader exclusionary wording, the Federal Circuit treats the proposal as impermissible claim redrafting. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc); *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014).

### 2.    The Plain and Ordinary Meaning Controls

Claim construction "begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). Those words are given their plain and ordinary meaning unless the patentee has acted as his own lexicographer or has clearly and unmistakably disavowed claim scope. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc); *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365–66 (Fed. Cir. 2012). Despite advocating for a construction other than the plain and ordinary meaning, Defendants do not—and cannot—satisfy that demanding standard.

Optiver fails to identify any portion of the intrinsic record where the patentee defined "clock domain crossing operations" in a manner that departs from its ordinary meaning. Nor do they point to any "clear and unmistakable" disclaimer. *Thorner*, 669 F.3d at 1366–67. That omission is dispositive. "[T]he standard for disavowal of claim scope is exacting," and courts may not narrow claims absent such a clear indication. *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014).

The phrase itself is readily understandable in context. The patents explain that FPGA systems operate across multiple clock domains and must address synchronization between those domains. See, e.g., '286 patent at 1:31–39 (describing the "need to synchronize" different clocks); see also id. at Fig. 1 (depicting receiver-side and transmitter-side clock domains and associated

10

data paths), 9:22–10:19 (describing operation across domains). A person of ordinary skill would understand "clock domain crossing operations that delay processing" to refer to the use of clock domain crossing operations that introduce additional latency. Because the intrinsic record confirms the ordinary meaning—and contains no lexicography or disavowal—the Court should apply that meaning. *Phillips*, 415 F.3d at 1314.

### 3. The Intrinsic Record Reinforces – rather than undermines – the plain and ordinary meaning as proffered in the claim as written

The intrinsic record reinforces—rather than undermines—the plain and ordinary meaning. The patents recognize that some delays exist and are acceptable (e.g., insignificant delays, zero-delay buffers, and wiring constraints, Ex. 1 at 14:29-44), while clock domain crossing operations that delay processing in the manner of the prior art are excluded. The patentee drew that line expressly. Optiver cannot redraw it.

The specification describes FPGA systems in which data flows between different clock domains and acknowledges that such crossings introduce latency. *See, e.g.*, '286 patent at 1:31–36 (describing prior-art FPGA systems used in high-frequency trading), 1:31–39 (identifying the need to synchronize clocks); see also id. at Fig. 1 (showing data moving from deserializer 104 through intermediate data paths to serializer 110 across different clock domains), 7:50–51, 9:22–10:19 (describing clock domain interactions and processing).

These disclosures provide technical context for the claimed inventions, which seek to improve synchronization and reduce latency. But they do not redefine "clock domain crossing operations" or limit the term to any particular structure, circuitry, or mechanism. While, as Optiver notes, the specification refers to clock domain crossings as introducing latencies, there is no definitional language, no express limitation, and no disavowal. That is fatal to Optiver's position. *Thorner*, 669 F.3d at 1365–66. Instead, Optiver attempts to extract features of certain

11

embodiments and elevate them into unexpressed claim requirements. That is precisely what the Federal Circuit has prohibited. "[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." *Phillips*, 415 F.3d at 1323.

Indeed, Optiver's own specification citations refute its position. Optiver relies on claim 1 of the '305 patent and claim 7, which depends therefrom. Claim 1, in relevant part, requires computational circuitry that performs the first set of operations to generate the second plurality of parallel processed data **without use of a** *clock domain crossing circuit*. Claim 7 further requires that the first set of operations **does not include** *clock domain crossing operations that delay processing* the first set of parallel data streams. Under Defendants proposed construction, claim 7 would essentially be rewritten to delete everything after "clock domain crossing operations" because, according to Defendants, such language is inherently present. Thus, claim 7 under Defendants' construction would effectively require "that the first set of operations does not include clock domain crossing operations ~~that delay processing the first set of parallel data streams~~." Claim 1 and claim 7 would have identical scope under Defendants' proposed construction, both requiring that the first set of operations be performed without [or not include] a clock domain crossing, or would have conflicting scopes. Under the plain and ordinary meaning, however, the phrase "that delay processing" narrows the category of excluded operations, so that dependent claim 7 meaningfully restricts the scope of independent claim 1 rather than merely restating it. "By definition, an independent claim is broader than a claim that depends from it." *Littelfuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376, 1379–82 (Fed. Cir. 2022).

Optiver's construction does not preserve dependent-claim validity—it destroys it. By treating "clock domain crossing operations that delay processing" as equivalent to "clock domain

crossing operations," Optiver renders the dependent limitation in claim 7 meaningless. Dependent claims must further limit, not merely restate, their parent claims. The Court should reject a construction that collapses that hierarchy absent a clear expression of intent—which is entirely absent here.

Defendants' proposed construction rewrites the phrase "clock domain crossing operations that delay processing" by deleting the words that define its scope and replacing them with a different, narrower rule. Because claim construction does not permit the Court to substitute Defendants' preferred language for the words the patentee chose, Defendants' construction should be rejected and the claim applied according to its plain and ordinary meaning.

**C.     Defendants' Proposed Constructions of "Based at Least" and "Based at Least in Part" Impermissibly Rewrite the Claims**

| Based at Least on the First Clock Signal | |
|---|---|
| **HFT** | **Optiver** |
| Plain and ordinary meaning, no construction is necessary.<br><br>"based at least on the first clock signal" | Based **[[at least]]** on the first clock signal <u>alone or with other input(s)</u> |

| Based at Least in Part on the First Clock Signal | |
|---|---|
| **HFT** | **Optiver** |
| Plain and ordinary meaning, no construction is necessary.<br><br>"based at least in part on the first clock signal" | Based **[[at least in part]]** on the first clock signal <u>and other input(s)</u> |

Defendants' proposed constructions of the phrases "based at least on the first clock signal" and "based at least in part on the first clock signal" do not clarify the claim language. Instead, they delete language chosen by the patentee to set the minimum input requirement and replace it

13

with new requirements that narrow claim scope. That is not claim construction—it is claim redrafting. Nothing in the claims uses exclusive or negative language such as "only," "solely," or "and not based on," and courts may not infer such exclusions by implication.

### 1. The Claim Language Establishes a Minimum Requirement for Input, Which Defendants Eliminate

The phrase "based at least on" and its variant "based at least in part on" set a minimum input requirement between the first clock signal and the claimed output. The words "at least" are critical. As written, the claims cover results that are based on the first clock signal **to any degree at or above the stated minimum**. That includes results based entirely on the first clock signal as well as results based on the first clock signal together with other inputs. Defendants' constructions change that meaning.

Defendants' constructions remove this minimum-setting function. By rewriting "based at least on the first clock signal" as "based [[at least]] on the first clock signal <u>alone or with other input(s)</u>," and "based at least in part on the first clock signal" as "based [[at least in part]] on the first clock signal <u>and other input(s)</u>," Defendants delete the words "at least" and replace them with formulations that impose **new, unstated conditions**. In particular, by requiring that "other input(s)" be present for the "based at least in part" limitation, Defendants exclude embodiments where the first clock signal alone provides the basis for the result.

That exclusion does not appear in the claim language. If the patentee had intended to require that the claimed result be based on the first clock signal **and at least one additional input**, the claims could have said so. They did not. The Court may not rewrite the claims to supply that limitation now. *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).

Claim construction may not "delete, rewrite, or ignore" express claim language, even when a party claims it is doing so to improve clarity. *Eon Corp. IP Holdings LLC v. Silver Spring*

14

*Networks, Inc.*, 815 F.3d 1314, 1320 (Fed. Cir. 2016). Courts have repeatedly rejected constructions that transform inclusive claim language into exclusionary requirements by implication. *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1366–67 (Fed. Cir. 2012). Defendants' proposals do exactly that. The Federal Circuit has been clear that words such as "at least" establish a minimum threshold, not a ceiling, and do not exclude greater degrees of satisfaction. *See, e.g.*, *Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 546 (Fed. Cir. 1994) (construing "at least two" as setting a minimum requirement, not a maximum); *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1584 (Fed. Cir. 1995) (explaining that "at least" denotes a minimum—"600 on up"—and establishes a lower bound of a range). Reading "at least in part" to exclude 100% reliance inverts the ordinary function of "at least" and contradicts basic logic: a whole necessarily includes its parts.

**2.      The Intrinsic Record Does Not Support Optiver's Attempted Narrowing**

The specification does not redefine "based at least in part on" to require a second signal. The patents describe FPGA systems involving multiple clock domains and synchronization among receiver-side and transmitter-side clocks. See '286 patent at 1:31–39; Fig. 1; 9:22–10:19. But those disclosures simply provide technical context. They do not state that every result "based at least in part on the first clock signal" must also depend on another signal or input. That absence is fatal to Optiver's position. To depart from ordinary meaning, Optiver must show lexicography or clear disavowal. *Thorner*, 669 F.3d at 1365–66. It does neither.

Optiver's construction excludes what the patent expressly discloses. Figure 9A teaches generating the receiver-side clock based solely on the first clock signal. If a clock generated entirely from the first clock signal is *not* "based at least in part" on that signal, then the phrase becomes internally incoherent. The Federal Circuit has repeatedly cautioned against constructions that exclude disclosed embodiments without compelling evidence. *Invitrogen Corp. v. Biocrest*

*Mfg., L.P.*, 327 F.3d 1364, 1369 (Fed. Cir. 2003). ("Construing a claim to exclude a preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support."). Optiver offers none.

The specification teaches that some embodiments may involve multiple inputs and others involve solely the first clock signal. But the Federal Circuit has repeatedly warned that features of embodiments cannot be imported into the claims absent clear intent to do so. *Phillips*, 415 F.3d at 1323. Optiver's argument does exactly that: it takes the possibility of multiple inputs in some disclosed systems and converts it into a mandatory claim requirement. The intrinsic record teaches the contrary.

Optiver's reliance on *Laboratory Corp. v. Qiagen* is misplaced. Mot. at 14.  In *Laboratory Corp.*, the disputed terms imposed mutually exclusive scopes: "identical" required identity with a whole, while "identical to a portion" expressly excluded the whole.  *Lab.'y Corp. of Am. Holdings v. Qiagen Scis., LLC*, 148 F.4th 1350, 1358 (Fed. Cir. 2025).  Here, by contrast, "based at least in part on" does not exclude reliance on a single input. The phrase sets a minimum causal requirement, not a mandatory plurality of inputs. Reading this clause as proposed would impermissibly transforms "at least in part" into a ceiling limitation that the claim language does not contain.

Finally, Optiver's extrinsic dictionary citations fail because they disregard the operative language of the claims. The phrase is not "in part," but "at least in part." Courts construe claims as a whole, not by isolating individual words. As used here, "at least" sets a minimum causal contribution—it does not impose a ceiling or require additional inputs. If a result is based entirely on the first clock signal, it is necessarily also based at least in part on that signal. Optiver's contrary reading rewrites the claim and contradicts both logic and the intrinsic record.

Defendants' constructions of "based at least" and "based at least in part" do not interpret the claim language; they **replace it**. By removing minimum-setting language and inserting new plurality and exclusivity requirements, Defendants materially narrow the claims in ways the patentee did not choose. Because claim construction does not permit rewriting claims to add limitations or alter scope, Defendants' proposed constructions should be rejected and the claims applied according to their plain and ordinary meaning.

In short, Defendants ask the Court to substitute narrower language for the words the patentee actually used—a step claim construction does not permit.

## V.    CONCLUSION

For the reasons set forth above, Defendants' proposed constructions should be rejected because they do not clarify ambiguous claim language—they rewrite clear claim terms by deleting express modifiers and adding narrowing requirements the patentee did not choose. Defendants' attempts to convert conditional and minimum-setting limitations into categorical exclusions or mandatory plurality requirements would materially alter claim scope under the guise of clarification.

Accordingly, to the extent the Court elects to construe the disputed phrases, it should reject Defendants' proposed rewrites and apply the claim language according to its plain and ordinary meaning.

Dated: April 15, 2026

Respectfully submitted,

*/s/ Dale Chang*
Marc Fenster
Brian Ledahl
Dale Chang
Paul Kroeger
Susan Y. Tull
Joshua Sheufler
RUSS AUGUST & KABAT
12424 Wilshire Blvd. 12th Floor
Los Angeles, CA 90025
Telephone: 310-826-7474

**ATTORNEYS FOR PLAINTIFF HFT SOLUTIONS, LLC**

18

**CERTIFICATE OF SERVICE**

I hereby certify that on April 15, 2026, I electronically filed the foregoing document with the Clerk of the Court for the Western District of Texas using the ECF System which will send notification to the registered participants of the ECF System as listed on the Court's Notice of Electronic Filing.

/s/ *Dale Chang*
Dale Chang